UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

MATTHEW RUDAVSKY,           )
                                  )
     Plaintiff,          )
                                  )
     v.                   )     Case No. 2:18-cv-25
                                  )
CITY OF SOUTH BURLINGTON;     )
CHRISTOPHER BATAILLE;         )
PATRICK MULCAHY; DAVID       )
SOLOMON; KENNETH SOFFEN;     )
EDWARD SOYCHAK; JEFFREY     )
MARTEL; PAUL EDWARDS;        )
NICHOLAS HOLDEN; TREVOR     )
WHIPPLE; and JAMES MILLS,   )
                                  )
     Defendants.         )

## OPINION AND ORDER

Plaintiff Matthew Rudavsky brings this action claiming that he was assaulted by a police officer while in the custody of the South Burlington Police Department (SBPD). Now pending before the Court are two motions to dismiss: the first filed by the City of South Burlington, SBPD Chief Trevor Whipple, SBPD Deputy Chief Paul Edwards, and Lieutenant Jeffrey Martel (the "Municipal Defendants") (ECF No. 4); and the second a partial motion to dismiss by Detective Christopher Bataille, Officer Patrick Mulcahy, and Sergeant David Solomon (the "Officer Defendants") (ECF No. 11). For the reasons set forth below, the Municipal Defendants' motion to dismiss is **granted in part and denied in part**, and the Officer Defendants' partial motion to dismiss is **granted in part and denied in part**.

## Factual Background

The Complaint alleges that on January 12, 2015, several SBPD officers responded to a report of a verbal altercation.  Those officers included Officer Mulcahy, Sergeant Mills, Sergeant Soychack, Detective Bataille, and Sergeant Soffen.  Plaintiff Rudavsky was arrested at the scene, handcuffed, and transported to the South Burlington police station.  The police noted that Rudavsky smelled strongly of intoxicants.

During processing at the police station, Detective Bataille and one of the other police officers removed Rudavsky's handcuffs.  Officer Mulcahy subsequently joined Detective Bataille in the holding area to assist with Rudavsky's fingerprinting.  Rudavsky refused to be fingerprinted, at which point Officer Mulcahy, Detective Bataille, and Officer Holden restrained him and re-cuffed him with his hands behind his back.

Once handcuffed, Rudavsky was escorted to a different holding cell by Detective Bataille and Officer Mulcahy. Detective Bataille then seated Rudavsky, still handcuffed, on a metal bench facing away from both officers.  The Complaint alleges that the two officers were standing behind Rudavsky and to his right.

While Detective Bataille was manipulating Rudavsky's handcuffs, Rudavsky allegedly made a comment about him and shifted to look at the officers.  Detective Bataille, with one

hand on Rudavsky's cuffed arms and the other on his right shoulder, allegedly "attacked Rudavsky by roughly propelling him forward and downward, slamming him, head first, to the concrete floor of the holding cell."  ECF No. 7 at 4, ¶ 39.  Officer Mulcahy allegedly jumped forward to aid Detective Bataille. Another officer, possibly Sergeant Solomon, pointed a weapon at Rudavsky.  There is a videotape of the incident.

Rudavsky claims that before he was "attacked" he did not pose a threat to anyone, as he was seated and handcuffed.  He also contends that Officer Mulcahy had a chance to intervene but failed to do so.  Sergeant Solomon, Sergeant Mills, and/or Officer Holden were in the general vicinity and able to either see or hear the alleged assault by Detective Bataille.

Rudavsky's head began to bleed, and his wounds were treated by members of the South Burlington Fire Department.  He now contends that his medical care was inadequate.  He also claims that he complained about his treatment, but that his complaints were never addressed or investigated.  He faults the SBPD for accepting allegedly-false incidents reports, and Chief Whipple for failing to order an administrative review of the incident despite the videotape evidence.

Rudavksy's legal claims include excessive force in violation of the United States and Vermont Constitutions; common law assault and battery; contravention of the SBPD's use of force

policy; failure to train; and failure to properly act upon reports. In total, the Complaint asserts ten causes of action, including claims of municipal and vicarious liability.

**Discussion**

## I.   The Motion to Dismiss Standard

Now before the Court are the motions to dismiss filed by the Municipal Defendants and the Officer Defendants. Both motions are filed pursuant to Federal Rule of Civil Procedures 12(b)(6).

In reviewing a complaint under Rule 12(b)(6), a court applies a "plausibility standard" guided by "two working principles." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.") (internal citations omitted). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. Thus, the complaint must contain "factual amplification . . . to render a claim plausible." *Arista Records LLC v. Doe 3*, 604 F.3d

4

110, 120 (2d Cir. 2010) (quoting *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009)).

At the motion to dismiss stage, all of the factual allegations in the complaint will be taken as true. *Iqbal*, 556 U.S. at 678. Those allegations will also be viewed in the light most favorable to the plaintiff, and all inferences will be drawn in his favor. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013); *see also York v. Ass'n of the Bar of the City of New York*, 286 F.3d 122, 125 (2d Cir. 2002) ("On a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true."), *cert. denied*, 537 U.S. 1089 (2002).

## II.  The Municipal Defendants' Motion to Dismiss

In this case, the Complaint asserts several causes of action against the City, Chief Whipple, Deputy Chief Edwards, and Lieutenant Martel. Specifically, Count III brings a claim against the City under 42 U.S.C. § 1983 and *Monell v. Department of Social Services*; Count IV asserts a claim against Chief Whipple, Deputy Chief Edwards, and Lieutenant Martel for supervisor liability under Section 1983; Count V alleges a conspiracy to cover up unconstitutional acts; Count VI includes a claim against the City under 24 V.S.A. §§ 901-901a for the officers' alleged negligence; Count VII alleges negligent

training, retention, and supervision; and Count X alleges
vicarious liability on the part of the City.

A.    **The City's Municipal Liability**

The City first moves to dismiss Rudavsky's Section 1983
municipal liability claims.  Those claims are brought in Count
III, premised on a custom or policy of allowing excessive force,
and Count V, the conspiracy claim.

It is well established that "under § 1983, local governments
are responsible only for 'their *own* illegal acts.' . . .  They
are not vicariously liable under § 1983 for their employees'
actions."  *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting
*Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986) (emphasis in
*Pembaur*)); *see Monell v. Dep't of Soc. Servs. of the City of New
York*, 436 U.S. 658, 665-83, 691 (1978).  Plaintiffs who seek to
impose liability on local governments under Section 1983 must
prove that the individuals who violated their federal rights took
"'action pursuant to official municipal policy.'"  *Connick*, 563
U.S. at 60 (quoting *Monell*, 436 U.S. at 691).

"Official municipal policy includes" not only "the decisions
of a government's lawmakers," but also "the acts of its
policymaking officials, and practices so persistent and
widespread as to practically have the force of law. . . .  These
are 'action[s] for which the municipality is actually
responsible.'"  *Connick*, 563 U.S. at 61 (quoting *Pembaur*, 475

U.S. at 479-80.  Accordingly, a Section 1983 plaintiff need not prove that his injury was caused by an explicitly-stated municipal rule or regulation.

A municipality may also be held liable for inaction if, in its failure to act, a policymaker "'exhibit[ed] deliberate indifference to constitutional deprivations caused by subordinates.'" *Cash v. County of Erie*, 654 F.3d 324, 334 (2d Cir. 2011) (quoting *Amnesty America v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004)), *cert. denied*, 565 U.S. 1259 (2012); *see generally City of Canton, Ohio v. Harris*, 489 U.S. 378, 388-92 (1989).  "[D]eliberate indifference is a stringent standard of fault." *Connick*, 563 U.S. at 61, 131 S.Ct. 1350 (internal quotation marks omitted).  "A showing of simple or even heightened negligence will not suffice." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 407 (1997) (internal quotation marks omitted); *see, e.g., Amnesty America*, 361 F.3d at 128 ("The operative inquiry is whether the facts suggest that the policymaker's inaction was the result of a 'conscious choice' rather than mere negligence.") (quoting *City of Canton*, 489 U.S. at 389).

To proceed on a theory of deliberate indifference, a plaintiff must first establish "that 'the need for more or better supervision to protect against constitutional violations was obvious.'" *Amnesty America*, 361 F.3d at 127 (quoting *Vann v.*

7

*City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995)). This "obvious need may be demonstrated through," for example, "proof of repeated complaints of civil rights violations." *Vann*, 72 F.3d at 1049; *see, e.g., Connick*, 563 U.S. at 61-62 ("[A] city's 'policy of inaction' in light of notice that its program will cause constitutional violations 'is the functional equivalent of a decision by the city itself to violate the Constitution.'") (quoting *City of Canton*, 489 U.S. at 395 (opinion of O'Connor, J., concurring in part and dissenting in part)); *Ricciuti v. New York City Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991) ("The inference that a [municipal] policy existed may . . . be drawn from circumstantial proof, such as . . . evidence that the municipality had notice of but repeatedly failed to make any meaningful investigation into charges that police officers had used excessive force in violation of the complainants' civil rights.").

Finally, the plaintiff must show "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton*, 489 U.S. at 385; *see, e.g., Cash v. Cnty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) ("to establish municipal liability under § 1983, a plaintiff must prove that 'action pursuant to official municipal policy' caused the alleged constitutional injury") (quoting *Connick*, 563 U.S. at 60).

Here, Rudavsky claims that the City had a custom of condoning or acquiescing in the use of excessive force by its police officers. The Complaint also accuses the Municipal Defendants of failing to properly train, supervise, and/or discipline its officers regarding the use of excessive force. These conclusory allegations, reciting only the elements of a cause of action, are by themselves insufficient.

Rudavsky also claims, however, that the City and its police officers consciously failed to adhere to the City's Use of Force Policy. That policy allegedly had a protocol requiring reports and reviews whenever an officer uses more than light physical force or compliant escort techniques. In this case, the incident reports were allegedly at odds with the actions depicted on the videotape. Rudavsky claims that despite the existence of the videotape, officers in the chain of command accepted the inaccurate reports, and Chief Whipple in particular failed to appoint an Administrative Review Board to investigate.

The Municipal Defendants concede, for purposes of the present motion, that Chief Whipple was a city policymaker. While the actions of subordinate employees do not, in and of themselves, constitute a "custom" or "practice," the single act of a municipal policymaker can give rise to municipal liability. *See Pembaur*, 475 U.S. at 480. And as discussed above, a municipal policymaker's failure to act can trigger municipal

liability where such a failure amounts to deliberate
indifference.  *City of Canton*, 489 U.S. at 388; *Walker v. City of
New York*, 974 F.2d 293, 297 (2d. Cir. 1992).

In order to succeed on his claims, Rudavsky will need to
show not only that a City policymaker failed to act, but that the
failure was reflective of a custom or practice and had a causal
link to the alleged use of excessive force.  The Complaint
implies such connections, but falls short of establishing them.
Nonetheless, at the motion to dismiss stage, the Court must draw
all inference in favor of Rudavsky. *See Cohen*, 711 F.3d at 359.
Rudavsky contends that there was a practice in the SBPD of
downplaying episodes of excessive force, and that this practice
allowed Detective Bataille and others to feel safe from
retribution or discipline when they used such force.  His
allegations of falsified reports and inaction by senior officers,
including at least one policymaker, amplify his claim.
Accordingly, the Court will allow him to develop this theory in
the course of discovery, and the City's motion to dismiss on the
basis of *Monell* is **denied.**

**B.   Supervisory Liability**

The Municipal Defendants next argue that Rudavsky has failed
to plead sufficient facts to support his claims of Section 1983
supervisory liability against Chief Whipple, Deputy Chief
Edwards, or Lieutenant Martel.  "[A] defendant in a § 1983 action

may not be held liable for damages for constitutional violations merely because he held a high position of authority." *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996); *see also Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). Rather, "a plaintiff must establish a given defendant's personal involvement in the claimed violation in order to hold that defendant liable in his individual capacity." *Warren v. Pataki*, 823 F.3d 125, 136 (2d Cir.), *cert. denied sub nom. Brooks v. Pataki*, 137 S. Ct. 380 (2016). As the Second Circuit has explained, the personal involvement of a supervisory defendant may be shown by evidence that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

There is no allegation that any of the supervisors in question participated directly in the alleged use of excessive force. The Municipal Defendants assert in their briefing that the remaining four *Colon* factors can be viewed as analytically equivalent to the requirements for municipal liability. If so, their motion to dismiss fails for the same reasons as set forth

above.  Rudavsky alleges that supervisors intentionally ignored the video evidence, accepted inaccurate written reports, failed to remedy the wrong, and that Chief Whipple failed to initiate an administrative review.  Rudavsky further claims that these actions constituted deliberate indifference to his constitutional rights.  If proven, those claims would be sufficient to present a claim of Section 1983 supervisory liability.  The motion to dismiss the supervisory liability claims against Chief Whipple, Deputy Chief Edwards, and Lieutenant Martel is therefore **denied**.

### C.   Conspiracy Claim

The Municipal Defendants next contend that Rudavsky has failed to state a plausible claim of conspiracy.  A conspiracy claim under Section 1983 must allege: (1) an agreement existed between two or more state actors to act in concert to inflict an unconstitutional injury on plaintiff and (2) an overt act was committed in furtherance of that goal.  *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002).  Vague and conclusory allegations that defendants have engaged in a conspiracy must be dismissed.  *Ciambriello*, 292 F.3d at 325; *Webb v. Goord*, 340 F.3d 105, 110-11 (2d Cir. 2003) (to maintain a conspiracy action, the plaintiff "must provide some factual basis supporting a meeting of the minds").

Here, the Complaint alleges that "[t]he total failure of any SBPD employee, from individual officer[s] all the way up to

Police Chief Whipple, to even acknowledge the possibility that
excessive force was used against Rudavsky, demonstrates a meeting
of the minds among them to ignore or cover up evidence of [the]
deprivation of Rudavsky's constitutional rights."  ECF No. 7 at
15, ¶ 136.  In the context of other factual allegations in the
Complaint, this claim asserts a concerted pattern or policy of
ignoring or downplaying excessive force within the SBPD, and
explicit actions consistent with that pattern in the case of the
Rudavsky incident.  The Court need not decide whether such
allegations are sufficient, however, as this claim is barred by
the doctrine of intra-corporate (or intra-enterprise) conspiracy.

Under the intra-corporate conspiracy doctrine, officers,
agents and employees of a single corporate or municipal entity,
each acting within the scope of his or her employment, are
legally incapable of conspiring together.  *Herrmann v. Moore*, 576
F.2d 453, 459 (2d Cir. 1978) ("[T]here is no conspiracy [under
section 1985] if the conspiratorial conduct challenged is
essentially a single act by a single corporation acting
exclusively through its own . . . officers, and employees, each
acting within the scope of his employment."); *Everson v. N.Y.
City Transit Auth.*, 216 F. Supp. 2d 71, 76 (E.D.N.Y. 2002)
(noting that the doctrine includes allegations of conspiratorial
conduct between a public entity and its employees).  "Although
the Second Circuit has not yet expressly held this doctrine

13

applicable to Section 1983 suits, as it has for 42 U.S.C. § 1985, *see Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978), courts in this district have uniformly applied the rule to Section 1983 cases as well." *Dowd v. DeMarco*, 314 F. Supp. 3d 576, 587 (S.D.N.Y. 2018); *see also Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 388 (S.D.N.Y. 2013) (collecting cases); *Danielak v. City of New York*, 2005 WL 2347095, at *14 (E.D.N.Y. Sept. 26, 2005) (holding plaintiff's conspiracy claims barred by intra-corporate conspiracy doctrine because all of the individual defendants were employees of the New York City Police Department, and were acting within the scope of their employment as police officers when they arrested plaintiff).

There is an exception to the intra-corporate conspiracy doctrine that applies "to individuals within a single entity when they are pursuing personal interests wholly separate and apart from the entity." *Quinn v. Nassau County Police Dep't*, 53 F. Supp. 2d 347, 360 (E.D.N.Y. 1999). This "personal stake" exception applies "where law enforcement allegedly exercises official duties in unconstitutional ways in order to secure personal benefit." *Alvarez v. City of New York*, 2012 WL 6212612, at *3 (S.D.N.Y. Dec. 12, 2012); *see, e.g., Yeadon v. New York City Transit Auth.*, 719 F. Supp. 204, 207, 212 (S.D.N.Y. 1989) (holding that officers who allegedly engaged in race-based false arrests to "improve their arrest records in order to secure

14

promotions and other benefits" had "independent, conspiratorial purpose"). Here, there is no allegation that any of the officers in question engaged in harmful or unconstitutional conduct with the goal of securing a personal benefit. The conspiracy claim against the Municipal Defendants is therefore **dismissed.**

### D.    Vicarious Liability for Alleged Negligence

The Complaint asserts in Count VI that the City "is liable to Rudavsky for the torts of its police officers." ECF No. 7 at 17, ¶ 144. Count X similarly alleges vicarious liability. *Id.* at 19-21. Count VII alleges negligent training, retention, and supervision. *Id.* at 17. "Under the settled doctrine of respondeat superior, an employer or master is held vicariously liable for the tortious acts of an employee or servant committed during, or incidental to, the scope of employment." *Brueckner v. Norwich Univ.*, 169 Vt. 118, 122-23, 730 A.2d 1086, 1090 (1999). In *Doe v. Forrest*, the Vermont Supreme Court noted that "where a law enforcement official is overly aggressive in . . . performing the arrest of a suspect . . . the tortious conduct partially implements law enforcement goals, however inappropriately." 2004 VT 37, ¶ 18, 176 Vt. 476, 484, 853 A.2d 48, 55 (2004). Here, the alleged assault took place in the context of restraining a detainee in a police department holding cell, thus "partially implement[ing] law enforcement goals." *Id.*

The Municipal Defendants argue that Rudavsky's causes of

action should each be dismissed, first because assault is an intentional tort and not an act of negligence. With respect to the City of South Burlington, it does not appear that Rudavsky is making any claim of direct negligence. Rather, he claims that the City is vicariously liable to the extent that it failed to either supervise or prevent the unlawful actions of the officers in question. As to the actions of Detective Bataille, Officer Mulcahy and Sergeant Solomon, Rudavsky appears to merely be pleading negligence in the alternative. *See* ECF No. 7 at 16, ¶ 143 ("As a direct, proximate and foreseeable result of Detective Bataille's and Officer Mulcahy's and Sergeant Solomon's negligence, recklessness or intentional actions . . .").

The Municipal Defendants further contend that while a claim of negligent supervision requires knowledge by the employer of the employee's propensity for misconduct, and that the misconduct was therefore foreseeable, no such knowledge is alleged. They also argue they owed no duty of care to Rudavsky.

The question of foreseeability must viewed in the context of the alleged pattern, practice, and/or policy with respect to the use of excessive force. If, as alleged, the SBPD had a practice of overlooking or downplaying incidents of excessive force, and perhaps even had a tacit agreement among SBPD personnel to cover up such incidents, then it was foreseeable that officers would be inclined to use such force without fear of discipline. The Court

takes no position about the existence any such policy or practice within the SBPD, but at this early stage in the case must accept the allegations in the Complaint as true. Accordingly, the matter of foreseeability has been pled and must now be proved.

As to the question of a duty, and to the extent the pleadings set forth claims of negligence as opposed to intentional torts, it is generally accepted that "the actor who takes custody of a prisoner . . . is properly required to give him the protection which the custody or the manner in which it is taken has deprived him." Restatement (Second) of Torts § 320 (1965). In other words, when a detainee has been taken into custody and is, for example, handcuffed, he is unable to defend himself from attack and is owed a duty of protection by his custodian. "That duty does not, however, render the State an insurer of inmate safety. Like other duties in tort, the scope of the State's duty to protect inmates is limited to risks of harm that are reasonably foreseeable." *State v. Sanchez*, 99 N.Y.2d 247, 253, 784 N.E.2d 675, 678 (2002).

As noted above, foreseeability in this case may be determined by the customs or practices in the SBPD, which have yet to be proven. At the pleading stage, the Court will allow discovery on those questions and permit the vicarious liability claims against the Municipal Defendants to proceed. The claims of failure to properly train, supervise, and retain are similarly

enmeshed with the alleged policies, customs, and practices, and will be allowed to proceed as well.

Finally, the Municipal Defendants argue that Count X should be dismissed because vicarious liability is not an independent cause of action. As one district judge in this Circuit has commented, "while I agree that this is generally an evidentiary issue rather than an independent cause of action, there is authority to support the pleading of vicarious liability as a separate claim." *Hughes v. BCI Int'l Holdings, Inc.*, 452 F. Supp. 2d 290, 306 (S.D.N.Y. 2006). Consequently, Count X, though it depends upon proof of claims asserted in related Counts, will not be dismissed at this time. The Municipal Defendants' motion to dismiss is **granted** with respect to Rudavsky's conspiracy claim, and is otherwise **denied.**

## III. The Officer Defendants' Partial Motion to Dismiss

The Complaint asserts claims against the Officer Defendants (Bataille, Mulcahy, and Solomon) in eight separate Counts. Count I is brought under Section 1983, claiming violations of Rudavsky's Fourth, Eighth, and Fourteenth Amendment rights to be free from excessive force. Count II is also a Section 1983 claim, brought against Detective Bataille for physical contact and Officer Mulcahy for failure to intervene. Count IV is a supervisor liability claim against Sergeant Solomon. Count V alleges a cover-up conspiracy involving the Officer Defendants,

among others; Count V alleges negligence; Count VII is brought against Sergeant Solomon for negligent training, retention, and supervision; Count VIII charges all of the Officer Defendants with assault and battery; and Count IX alleges intentional infliction of emotional distress.

### A. Sergeant Solomon Aimed His Weapon

The Officer Defendants first move to dismiss all claims brought against Sergeant Solomon based upon the allegation that he pointed a weapon at Rudavsky.  Their motion asserts qualified immunity, arguing that it was not clearly established that Solomon was constitutionally barred from pointing his weapon.  The applicable claims are Count I for excessive force, Count VIII for assault and battery, and Count IX for intentional infliction of emotional distress.  The Court agrees that Sergeant Solomon is entitled to dismissal on those claims.

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  Accordingly, qualified immunity shields a defendant from standing trial or facing other burdens of litigation "if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively

reasonable for the defendant to believe that his action did not violate such law." *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 250 (2d Cir. 2001) (internal quotation marks omitted).

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id.* (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)); *see Malley v. Briggs*, 475 U.S. 335, 341 (1986) ("[I]f officers of reasonable competence could disagree on this issue, immunity should be recognized."). Whether it was objectively reasonable for an officer to believe that his acts did not violate the plaintiff's clearly established rights "has its principal focus on the particular facts of the case." *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004) (quoting *Hurlman v. Rice*, 927 F.2d 74, 78–79 (2d Cir. 1991)).

The Supreme Court has held that "'clearly established law' should not be defined 'at a high level of generality[,]'" but instead "must be 'particularized' to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam). Supreme Court and Second Circuit authority "does not require a case directly on point for a right to be clearly established, [however] existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (internal quotation marks

omitted) (citing *White*, 137 S. Ct. at 551); *see also Brown v. City of New York*, 862 F.3d 182, 190 (2d Cir. 2017) (stating that "[c]ontrolling authority serves to put officials on notice of what is unlawful"). Because the focus is on whether the officer had fair notice that his or her conduct was unlawful, "[o]nly Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established." *Moore v. Vega*, 371 F.3d 110, 114 (2d Cir. 2004). The defendant's entitlement to qualified immunity should be resolved 'at the earliest possible stage in litigation.'" *Lynch v. Ackley*, 811 F.3d 569, 576 (2d Cir. 2016) (quoting *Pearson*, 555 U.S. at 231-32).

In this case, Rudavsky was arrested for disorderly conduct and violating his conditions of release. After he made a comment and turned toward the two officers in the room, Detective Bataille pushed his head down and allegedly caused injury. When Sergeant Solomon entered the room, Rudavsky was on the floor, face down, handcuffed, and bleeding. Sergeant Solomon drew a weapon and aimed it at Rudavsky. The Complaint does not specify the type of weapon. There is no allegation that Sergeant Solomon said anything to Rudavsky, or that he discharged the weapon.

With respect to the question of a clearly established right, the parties have not cited any cases that would have put Sergeant Solomon on notice that merely pointing a weapon at Rudavsky was a

constitutional violation.  Though not binding, Judge Posner in
the Seventh Circuit noted that "[w]here the officer merely points
a gun at a suspect in the course of arresting him, the suspect
would have no basis for claiming that he had been seized with
excessive force in violation of the Constitution." *Wilkins v.
May*, 872 F.2d 190, 194 (7th Cir. 1989).  Other courts have
allowed that drawing a weapon may constitute excessive force, yet
those cases are easily distinguished on their facts.  For
example, in *Mlodzkinki v. Lewis*, 648 F.3d 24, 37-39 (1st Cir.
2011), the court denied qualified immunity to an officer who held
an assault rifle next to a 15-year-old girl's head for several
minutes.  In *Holland v. Harrington*, 268 F.3d 1179, 1197 (10th
Cir. 2001), the Tenth Circuit denied qualified immunity where a
SWAT team invaded a home to serve a misdemeanor warrant and
pointed its guns at children who were bystanders.  In this case,
Sergeant Solomon is alleged to have responded to an altercation
in a holding cell by pointing his weapon at the detainee.  Again,
the parties have cited no case law, and this Court is not aware
of any cases, that would clearly establish his actions as
unconstitutional.

Sergeant Solomon is also immune from Rudavsky's state law
claims.  "[T]he substantive law of Vermont governs the
applicability of qualified immunity to [a plaintiff's] state law
claims." *Napolitano v. Flynn*, 949 F.2d 617, 621 (2d Cir. 1991).

In Vermont, qualified immunity "attaches to public officials who are (1) acting during the course of their employment and acting, or reasonably believing they are acting, within the scope of their authority; (2) acting in good faith; and (3) performing discretionary, as opposed to ministerial, acts." *Murray v. White*, 155 Vt. 621, 627, 587 A.2d 975, 978 (1991). "Good faith exists where an official's acts did not violate clearly established rights of which the official reasonably should have known." *Id.* at 630, 587 A.2d at 980; *see Mellin v. Flood Brook Union Sch. Dist.*, 173 Vt. 202, 213, 790 A.2d 408, 419 (2001) ("We use an objective standard when assessing whether a public official's acts were taken in good faith.").

As with the federal claim, Rudavsky has not cited any case law for the proposition that Sergeant Solomon violated clearly established rights when he pointed his weapon. He was plainly acting within the scope of his duties, and given the lack of any clear constitutional violation, acted in good faith. Finally, the act of drawing and pointing a weapon was obviously discretionary, and Sergeant Solomon is immune from all state law claims relating to his pointing a weapon.

The Officer Defendants next argue that the failure-to-intervene and negligence claims against Detective Bataille and Officer Mulcahy, to the extent those claims are premised on an alleged failure to stop Sergeant Solomon from pointing his

weapon, should also be dismissed.  The Court agrees, and those claims are **dismissed.**  *See, e.g., Howard v. Ealing*, 876 F. Supp. 2d 1056, 1073 (N.D. Ind. 2012) *(*"As to the gun pointing allegation, the Court has already concluded that this did not amount to excessive force; accordingly, there can be no failure to intervene claim based on this action against any of the Defendants.").

### B.    Detective Bataille and Officer Mulcahy

The Officer Defendants next move the Court to apply qualified immunity to allegations that Detective Bataille, with Officer Mulcahy standing by, applied deadly force.  They distinguish Rudavsky's deadly force claim because there is United States Supreme Court and Second Circuit precedent applying strict standards to deadly force cases.  In *Tennessee v. Garner*, 471 U.S. 1, 3 (1985), the Supreme Court held that the use of lethal force "to prevent escape" would not be constitutionally unreasonable "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others."  In *O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d 29 (2d Cir. 2003), the Second Circuit similarly held that "[i]t is not objectively reasonable for an officer to use deadly force to apprehend a suspect unless the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the

officer or others." *Id.* at 36. The Officer Defendants argue that, assuming these standards apply to all deadly force cases, Detective Bataille did not use deadly force.

The Court offers no opinion at this time as to whether the *Garner*/*O'Bert* standards apply in this case. Instead, the Court finds that the record has not been sufficiently established to determine whether Detective Bataille did, in fact, use so much force that the alleged assault could have been lethal. The motion to dismiss the claim of deadly force is therefore **denied.**

### C. Incorporated Arguments

The Officer Defendants's final three argument incorporate by reference the arguments presented by the Municipal Defendants with respect to Section 1983 supervisory liability, the intra-enterprise doctrine defense to Rudavsky's conspiracy claim, and the claims of state law vicarious liability and negligence. For the same reasons discussed above in the Court's rulings on the Municipal Defendants' motion, the motion to dismiss the Section 1983 supervisory liability claims is **denied**, the motion to dismiss Rudavsky's conspiracy claim is **granted,** and the motion to dismiss claims of vicarious liability and negligence is **denied.**

### Conclusion

For the reasons set forth above, the Municipal Defendants' motion to dismiss (ECF No. 4) is **granted in part and denied in part,** and the Officer Defendants' partial motion to dismiss (ECF

No. 11) is **granted in part and denied in part.**

DATED at Burlington, in the District of Vermont, this 27th day of September, 2018.

/s/ William K. Sessions III
William K. Sessions III
District Court Judge