# UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF VERMONT

MATTHEW RUDAVSKY,                          :
                                           :
        Plaintiff,                 :
                                           :
        v.                         :   Case No. 2:18-cv-25
                                           :
CITY OF SOUTH BURLINGTON;                  :
CHRISTOPHER BATAILLE;                      :
PATRICK MULCAHY; DAVID                     :
SOLOMON; JEFFREY MARTEL;                   :
PAUL EDWARDS; TREVOR WHIPPLE;              :
                                           :
        Defendants.                :

## OPINION AND ORDER

(ECF Nos. 112, 114, 115)

Plaintiff Matthew Rudavsky ("Rudavsky" or "Plaintiff")
brings this action claiming that he was assaulted by a police
officer while in the custody of the South Burlington Police
Department ("SBPD"). Now before the Court are three motions for
summary judgment: the first filed by the City of South
Burlington, Trevor Whipple, Paul Edwards, and Jeffrey Martel
(the "Municipal Defendants") (ECF No. 112); the second filed by
Christopher Bataille and Patrick Mulcahy (the "Officer
Defendants") (ECF No. 114); and the third filed by David Solomon
(ECF No. 115). On April 26, 2021, the Court held a hearing on
these motions for summary judgment. For the reasons set forth
below, the Municipal Defendants' motion for summary judgment and

the Officer Defendants' motion for summary judgment are **granted in part and denied in part,** and Solomon's motion for summary judgment is **granted.**

**Factual Background**

### I.   Undisputed Facts

Rudavsky is 39 years old and lives in Burlington, Vermont. ECF 114-4 at 6. On January 12, 2015, Rudavsky was subject to conditions of release for an unlawful trespass charge. ECF 114-5. Included in his conditions were the conditions that he must not drink any alcoholic beverages and that he must submit to an Alco sensor upon request of a law enforcement officer. That January, the SBPD employed the following individuals in the following positions: Defendant Christopher Bataille as a patrol officer, Defendant Patrick Mulcahy as a police officer, Defendant David Solomon as a Sergeant, Defendant Jeffrey Martel as a Lieutenant, Defendant Paul Edwards as the deputy chief, and Defendant Trevor Whipple as the police chief. The SBPD also employed Sergeant James Mills, Nicholas Holden and Sergeant Edward Soychak.

Incident on January 12, 2015

On January 12, 2015, Rudavsky was working for Daniel McFadden at D&M Moving. ECF No. 114-4. Rudavsky, McFadden, and one other worker were moving someone's belongings out of a residence on Pearl Street. At approximately nine a.m., Rudavsky

began drinking. He drank a large bottle of wine, some beer, and "possibly some hard alcohol" that he believes the owners had put in a box outside to be thrown away. He drank to the point of intoxication, while managing to hide his consumption from his coworkers.

Once the contents from the residence on Pearl Street were loaded into a van, the three men drove in the van to Maplefields to stop for coffee. Back in the van, Rudavsky had a disagreement with McFadden about his pay. Rudavsky asked to be dropped off at the next closest spot to pull over: 5 Dorset Street. Rudavsky believes that he threw his coffee cup at the side of the truck. McFadden called the SBPD and described a verbal altercation in which Rudavsky ended up throwing his cup of coffee in the cab and threatening that he would burn the truck. ECF No. 121-21.

Rudavsky then entered a construction site at the Dorset Street location and asked to borrow a phone. He next remembers the SBPD asking him to come out and speak to them, which he did. He does not recall the conversations between himself and the officers, nor their identity, though he does recall that they were all males, and that there were approximately four of them.

Soychak, Mills, Mulcahy and Holden first responded to the call about a disorderly subject in the Dorset Street area. Soychak testified that the subject matched the description, and they followed him into a motel under construction. ECF No. 114-

3

13. Mulcahy, who was in Phase 3 of a Field Training program with Holden, testified to observing Rudavsky being escorted by Mills and Soychak. ECF No. 114-7. Soychak testified that the officers became concerned that Rudavsky was incapacitated and put him into protective custody. ECF No. 114-13 at 14. They ran a criminal check on him and determined that he had conditions of release not to drink. Rudavsky at this time made several unsavory statements, such as that he "had fucked Mills's daughter."[1] Rudavsy was having trouble walking and would not complete his sentences. At one point, he tried to leave.

Mulcahy and Mills placed Rudavsky in handcuffs. Mulcahy testified that:

> He became verbally aggressive and abusive; he made several threats towards my family. At one point he turned to Sergeant Mills and said something to the effect of, I'm going to make a move on him, directed towards me; at which time I opened my expandable baton and displayed it, in an attempt to gain compliance, so we didn't have a fight inside of the lobby. Once the baton was displayed he backed down, and stopped being as threatening and abusive towards me, at which time I collapsed the baton and put it back in its holster.

ECF 114-7 at 84.

Bataille was also dispatched to 5 Dorset Street to assist the officers already on scene. He observed Mills and Mulcahy attempting to escort Rudavsky, who was in wrist restraints and

---

[1] Plaintiff admits that he made this statement but disputes any characterization of it as a threat because Mills does not have a daughter.

refusing to walk. According to Bataille, Rudavsky smelled strongly of alcohol and seemed to "strongly dislike" Mulcahy and Mills, so he introduced himself and asked if Rudavsky would be willing to take a breath test. ECF No. 114-6 at 118. Rudavsky said he was unwilling.

Bataille transported Rudavsky from 5 Dorset Street to the police station. He testified that during the drive Rudavsky was at times joking and conversational, and at other times sad or angry. He asked Bataille to take him somewhere for detox at one point, and began crying. Rudavsky recalls being placed in the back of the police cruiser, but not many other details, and cannot recall if he was in handcuffs while transported to the SBPD. ECF No. 114-4 at 24. He cannot recall any conversations that occurred on the drive, nor getting out of the vehicle.

Mulcahy testified that he helped get Rudavsky out of Officer Bataille's car, and helped walk him to the booking area, where they removed his handcuffs. ECF No. 114-7, at 123, 126. The SBPD booking area includes a main room equipped with computers, an adjacent room known as the AFIS room in which fingerprints are taken, and another adjacent room known as Mass Holding One (a holding cell containing a bench). Each of these rooms has a video camera (although not all of the videos have audio), and recordings of the interactions at the SBPD are available. ECF No. 114-W.

At the SBPD booking area, Rudavsky refused a Datamaster test of his breath. ECF No. 114-24. This was a violation of his conditions of release. After some discussion, Rudavsky was taken to the fingerprinting room but refused to have his fingerprints taken. He walked toward the door of the room. Bataille took Rudavsky by the arm and led him back to the fingerprint machine, saying that if he didn't have his fingerprints taken then, he would have to return to the station later to be fingerprinted. Mulcahy testified that he heard the conversation escalating in the fingerprinting room and so walked inside.

Rudavsky resisted having his fingerprints taken. He balled his hands into fists, and brought a finger in front of Mulcahy's face, pointing. Bataille tried again to get him to do the fingerprints, asking Mulcahy to hold one arm, but Rudavsky still resisted. ECF No.114-7 at 33-34. Rudavsky did not follow commands to put his hands behind his back. Instead, he held his arms at his sides and to his chest.

The officers concluded that Rudavsky would not cooperate with providing his fingerprints, and tried to get him up against the wall to contain him. Holden heard noises and came in to the booking area to assist. ECF No. 114-12 at 42. Holden grabbed Rudavsky's right arm and made sure Rudavsky didn't move so the three officers could gain control of his arms. The video shows a

struggle, and all three officers working to handcuff Rudavsky against the wall.

Louis Dekmar ("Dekmar") agreed in his deposition that Rudavsky became actively resistant in the fingerprinting room. ECF 114-14 at 193. Dekmar has been retained by Plaintiff as an expert witness. He is the chief of police for the City of LaGrange, Georgia. *Id.* at 6.

Bataille placed Rudavsky in handcuffs and led him from the fingerprinting room to Mass Holding One using a non-compliant escort. Mulcahy and Holden were nearby while Bataille led Rudavsky to Mass Holding One, but were not touching Rudavsky. The handcuffs were single locked but not double locked or checked for proper fit. Bataille testified that he did not double lock Rudavsky's handcuffs prior to leaving the AFIS room because Rudavsky was not compliant and the AFIS room is full of sharp objects.

Many of the facts of the events in Mass Holding One are disputed, though there is a video recording of the room. The parties agree that once in Mass Holding One, Bataille told Rudavsky to sit and Rudavsky did end up sitting on a bench in the room. The order to sit was the only instruction given by the officers to Rudavsky; neither Bataille nor Mulcahy told him to stop wiggling. Bataille testified that "[i]t was my intent to move him to a seated position for more stability and [sic] give

7

me the ability to properly make those cuffs comfortable for him." ECF No. 114-6 at 159-60.

The parties agree that SBPD's written policies instruct that officers, "upon placing handcuffs on a subject will, as soon as reasonably possible, check the handcuffs for proper fit and double lock them for safety." ECF 114-25, ¶47. The parties agree that failing to double lock handcuffs can cause nerve damage and crush injury and soft and sometimes hard tissue damage. Dekmar testified that it is important that handcuffs be applied properly, and that the safest position to handcuff a subject offering any kind of resistance is to place her or him on the ground. ECF No. 114-14 at 38-39. Dekmar also testified that handcuffed individuals have the potential to cause bodily harm to others. *Id.* at 40.

Bataille testified that he became aware that Mulcahy was standing somewhere off to his right and sort of behind him while he was attempting to adjust Rudavsky's handcuffs in Mass Holding One. ECF No. 114-6 at 261. The parties agree that Bataille asked Rudavsky if either of the cuffs were cutting off his circulation. Rudavsky told Bataille to call his lawyer. Bataille, behind Rudavsky, attempted to double lock the handcuffs. Bataille testified that "when [Rudavsky] was seated on the bench, he would not hold his hands still; they were moving around, they were grasping into fists, he was kind of

grabbing at me a little bit." *Id.* at 116. Bataille was unable to double lock the handcuffs.

The parties agree, and the video shows, that Rudavsky turned to his right while making comments. The parties agree that Bataille performed a takedown, that Rudavsky landed on the floor of Mass Holding One, and that his forehead was injured and began to bleed. He did not lose consciousness and immediately yelled. The conversation immediately following the takedown went along these lines[2]:

Rudavsky: Ahh!

Bataille: Hold still!

Rudavsky: Ahh. You slammed my head into the ground for no reason?

Bataille: I'm trying to double lock your handcuffs.

Rudavsky: I just said you were under investigation and now I'm bleeding out of my head.

Bataille: I'm trying to double lock--

---

[2] The Court notes that the audio of the video is not of a good enough quality for all statements made in Mass Holding One to be easily discerned, especially where different parties are speaking at once. For this reason, there is no point in making findings regarding the actual statements of the parties in Mass Holding One during the incident. However, where both sides agree that certain statements were said, or where Plaintiff has put forward a reading that is consistent with the audio, the Court will assume these statements were made for the purposes of ruling on this motion.

Holden came into Mass Holding One to assist by trying to hold Rudavsky in a prone position. He called for more assistance. Soloman arrived next holding his taser and pointing it in the direction of the floor and Rudavsky's back. Solomon told Holden to radio EMS to come and evaluate the injury to Rudavsky's forehead. Rudavsky stated that he was "going to file a fucking major lawsuit" and asked the officers if they knew Attorney Catherine Clark. Eventually three EMS individuals arrived and assessed Rudavsky.

After EMS left, Rudavsky was moved to another holding cell. He proceeded to bang his head against the cell door, yell profanities and smear blood on the door window. Eventually a protective covering was placed on Rudavsky. He was transported to UVMMC for evaluation. ER staff classified the visible injury to Rudavsky's forehead as an abrasion. Allison Sullivan is employed as an emergency room physician at UVMMC, and she determined that there was nothing that required any kind of immediate medical attention. Rudavsky did not receive stitches or bandaging at the emergency department.[3]

---

[3] Though the parties provide very detailed accounts of the hospital visit in their factual statements, because the hospital visit was not raised as an issue of fact in their briefs the Court assumes their familiarity with the facts of the visit and provides only a summary here.

Rudavsky never saw Trevor Whipple, Paul Edwards or Jeffrey Martel on January 12, 2015. Their only involvement in the case was reviewing the use of force reports.

SBPD Training and Policies

The parties agree that, prior to the incident involving Rudavsky, the SBPD had adopted policies including policies relating to all high-risk critical tasks. All officers of the SBPD must review all SBPD policies as a part of their field training, and all of them are required to review the use of force policy, among others, annually. The General Policy regarding use of force stated, in part, that employees of the SBPD would "use that force which is objectively reasonable to control a situation, effect an arrest or investigatory detention, overcome resistance to arrest, or defend themselves or others from harm." It said that "[w]hen the use of force is objectively reasonable the degree of force employed should generally be in direct relationship to the amount of resistance employed by the person or the immediate threat the person poses to the officer or others." Officers were instructed by the policy that they "must weigh the circumstances of each case and employ only that amount of force which is objectively reasonable to control the situation or persons."

The parties agree that, while Whipple was the chief of police, the SBPD had some mandatory training including

participation in the SBPD's Field Training Officer program. SBPD officers receive use of force training at the police academy as a part of their basic training to become certified as law enforcement officers in the State of Vermont. Prior to the incident with Rudavsky, the SBPD required police officers to also receive four hours of use of force and tactics refresher training each year under the supervision of a VCJTC-certified use of force and tactics instructor.

SBPD's use of force policy at the time of the incident with Rudavsky provided that officers applying force must complete a use of force form regarding the circumstances surrounding their use of force and any resulting injury. The sergeant, lieutenant, deputy chief and chief would then review the reports.  In the incident involving Rudavsky, Bataille, Mulcahy, and Holden all completed use of force reports. Solomon did not. The use of force reports were then reviewed by Solomon, Martel, Edwards and Whipple.

Solomon testified that he started reviewing use of force reports when he became a sergeant. ECF No. 114-8 at 117. When he looked at use of force reports he checked to make sure that they were properly filled out; he reviewed the narrative, reviewed the officer's report of the incident or affidavit of probable cause, and determined whether the particular technique used was appropriate at that time on the particular subject. He testified

that "We didn't have easy access to the videos, and I don't believe it was a requirement for us to review the videos." *Id.* at 122. Martel testified that he reviewed the officers' reports and affidavits of probable cause in his review of use of force reports, and that he would have done that when he reviewed the force report in this case. ECF No. 114-9 at 6, 21-22. Edwards testified that he did not review the video of the incident involving Rudavsky when he reviewed the use of force reports. ECF No. 114-10 at 142. Whipple said that he does not believe he looked at any information beyond the use of force report form. ECF No. 114-11 at 87.

## II.  Disputed Facts

The main facts the parties dispute center around the takedown in Mass Holding One, which is at the heart of the case.[4] The parties first dispute whether Rudavsky resisted sitting, as Defendants argue, or whether he was told to sit before he had even reached the bench, as Plaintiff argues. The video shows

---

[4] The Court notes that Plaintiff also disputes many of Defendants' "undisputed facts" surrounding the policies and training procedures at the SBPD. Plaintiff disputes some facts as immaterial, inadmissible, or disputed because the SBPD did not follow its own procedures. However, as discussed in detail below, these factual disputes are immaterial because Plaintiff fails to provide enough of a showing to be able to make a claim of municipal or supervisory liability. Furthermore, Plaintiff does not reference the disputes about the training processes at the SBPD in his brief. For these reasons, the Court does not provide a detailed account of these processes in this opinion.

Bataille leading Rudavsky to the bench and instructing him to sit twice – it also appears to show him putting some downward pressure on Rudavsky – however, the degree to which Bataille pushed Rudavsky down onto the bench, as opposed to the degree to which Rudavsky bent his own knees, is not clear from the video. 16:15:22-16:15:24.

Defendants argue that it is an undisputed fact that Bataille was concerned about Rudavsky's cuffs, and that he was "concerned for Rudavsky's safety because the handcuffs had not been double locked." Plaintiff does not dispute that Bataille testified as such, but does dispute that he was actually concerned, pointing out that even after the takedown Rudavsky's handcuffs were not adjusted until 16:48:27-47, over half an hour after Rudavsky was brought to the floor, and after he had been moved to a different location. Defendants respond that the cuffs were double locked at 16:22, and then adjusted later.

While Bataille is bent over the handcuffs, the parties dispute the degree to which Rudavsky would not hold his hands still as an act of resistance. Defendants say Rudavsky was moving his hands and that he was "kind of grabbing at Bataille a little bit." Plaintiff emphasizes the fact that his hands were obscured by Bataille's body and so are not within view of the video camera, as well as the fact that no one told him to hold his hands still. The parties also dispute whether the "preferred

14

location" for handcuffing a noncompliant suspect is prone on the
ground, because the parties dispute the level to which Rudavsky
was "actively resisting", and the parties dispute whether the
general procedure for handcuffing applies to this instance,
where Rudavsky was already handcuffed and it was the double lock
that was at issue.

The parties also dispute the characterization of Rudavsky's
eventual movement to the right. Defendants characterize the
movement as so:

> Rudavsky suddenly rotated his body to the right and swung
> his legs underneath and to the right of him, facing his
> toes towards Mulcahy, looking towards Bataille and/or
> Mulcahy, rotating his hips to the left, almost unweighting
> himself like he was about to get up, rotating his hands
> away from Bataille and down almost like he was going to use
> them to push himself off the bench.

ECF No. 121-2 at 24. Plaintiff points out that though Bataille
testified that Rudavsky gathered his feet under him, in fact
Rudavsky's feet were under him the whole time, and just before
the takedown, Rudavsky extended one of his legs in a manner that
would make it more, not less, difficult to stand up. The video
itself appears to show Rudavsky sitting with his legs underneath
him, then saying something along the lines of "I refuse to speak
… you can call my attorney in the morning, motherfucker…" then
Rudavsky appears to turn his upper body, legs shifting slightly
as well and one leg extending somewhat, to say "I'll bet you're

under investigation…" to Bataille.[5] Bataille then performs the takedown.

The parties also dispute the extent to which Bataille's initial movement in performing the takedown can be characterized as "stepping in between Mulcahy and Rudavsky." Furthermore, there is significant dispute over whether Bataille was fully focused on the handcuffs as Rudavsky turns to say something, or whether his head came up and he made eye contact with Rudavsky before taking him to the ground. The angle of the video is from behind Bataille's head: the Court has reviewed the video many times, and can only observe that Bataille's head is raised to some unknown degree in the split second before the takedown. Bataille testified that he believed that Rudavsky was moving toward Mulcahy in an attempt to assault Mulcahy. ECF No. 114-6 at 148:16-148:21 ("Mr. Rudavsky made an overt movement towards where Officer Mulcahy was standing. I believed that Mr. Rudavsky was about to attempt to assault Officer Mulcahy, and that's when I initiated the arm bar.").

The parties do not agree on whether the takedown could be categorized as a low level of force, and the parties and their experts disagree on what kind of takedown (arm bar takedown,

---

[5] As explained further below, though the Court provides some descriptions of the video in the Facts Section of this Opinion, any actual interpretation of the video should be done by the decider of facts and not this Court.

reverse arm bar takedown, etc.) Bataille performed, and thus
whether police academy instructors would have told officers to
use it on a handcuffed individual. Plaintiff points out that in
his deposition, Drew Bloom, an expert witness for Defendants and
Director of Administration at the Vermont Police Academy, said
that Bataille did not use an arm bar takedown. ECF 121-15 at 28.
Because of where Bataille's body was, Bloom said it was "closest
to" a reverse arm bar takedown, a technique not used on a
handcuffed individual. Bloom testified that though the Police
Academy talks about takedowns performed on handcuffed
individuals, "we don't teach anything specific how to do that."
Bataille testified that "My recollection of the training I
received at the Academy, which was ten years ago, is performing
this maneuver on padding in a gym, them saying to us you should
try to avoid this technique if it's possible; but in the event
that something bad is about to happen, you need to do what you
need to do, and it is important to control the person's descent
to the ground, given their hands being cuffed behind their
back." 114-6 at 250:5-250:13. He said he was "aware" that it
"can happen" that a handcuffed person on whom you use the arm
bar takedown can hit his head on the ground.

Defendants claim that the video shows that the takedown was
a controlled effort, and that it shows that "both of Officer
Bataille's hand are in contact with Plaintiff's body, with

17

Bataille's left hand holding Rudavsky's hands, his right hand grasping Rudavsky's shoulder, his body following Rudavsky closely down to the floor, and his left leg stepping carefully over Rudavsky to avoid stepping on him." The Court has reviewed the video, but cannot say definitively that Bataille guided Rudavsky to the ground so that Rudavsky only scraped his forehead, or that Bataille thrust Rudavsky to the ground so that his head smashed into the floor. The Court notes that for much of the takedown, the bodies of the officers block Rudavsky's body from view of the camera.

The parties also appear to dispute the extent of the injury, which Defendants sometimes characterize as a scrape. In his responses to interrogatories, Rudavsky described his injury as follows:

> I had a closed head injury, bruise and open wound. I also hurt my neck and back. I still get headaches multiple times a week that last for hours, sometimes all day. I also still have a scar on my forehead from where it split open when the police officer slammed my head into the ground. In addition to this, I have fear, panic and anxiety symptoms. I have nightmares and extreme sadness.

ECF No. 121-4 at 7.

Finally, though the parties agree that neither Rudavsky nor anyone representing Rudavsky made a complaint in the period after January 12, 2015 and before the complaint filed in this case, Rudavsky argues that the statements he made to SBPD officers while on the ground immediately after the takedown

amounted to a complaint to the SBPD. Plaintiff emphasizes
Holden's deposition, where Holden said that Rudavsky had made an
informal complaint at the time of the incident. ECF No. 121-9 at
43. Regarding further process in response to the complaint,
Holden testified: "[h]e would have to speak with us further
about it. And then we could address it with the supervisor, and
then he can make a formal complaint on his own."

## Discussion

### I.   Summary Judgment Standard

A court shall grant summary judgment if the movant shows
that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law. Fed. R. Civ.
P. 56(a). In making a determination on summary judgment, the
court must "construe all evidence in the light most favorable to
the nonmoving party, drawing all inferences and resolving all
ambiguities in its favor." *Dickerson v. Napolitano*, 604 F.3d
732, 740 (2d Cir. 2010). However, the non-moving party "may not
rely on conclusory allegations or unsubstantiated speculation."
*F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010)
(quotation omitted). In deciding a motion for summary judgment,
the trial court's function "is not to weigh the evidence or
resolve issues of fact, but to decide instead whether, after
resolving all ambiguities and drawing all inferences in favor of
the nonmoving party, a rational juror could find in favor of

that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

## II.  The Officer Defendants' Motion for Summary Judgment

The Officer Defendants seek summary judgment on all claims remaining against them. These claims include Counts I and II, claims for excessive force and failure to intervene, as well as Counts VI, VIII, and IX, state law claims for negligence, assault and battery and intentional infliction of emotional distress.

### A. Claims Against Mulcahy

The Complaint asserts a claim in Count I against Defendants Bataille and Mulcahy under Section 1983, claiming violations of Rudavsky's Fourth, Eighth, and Fourteenth Amendment rights to be free from excessive force. Count II is also a Section 1983 claim, brought against Mulcahy for failure to intervene. When asked at the hearing about Mulcahy's role, Rudavsky offered no reasons against granting summary judgment for Mulcahy on Count I, and the video of the takedown shows that though Mulcahy was in Mass Holding One during the incident, he did not physically bring Rudavsky to the ground.[6] At the hearing on April 26, 2021, Plaintiff's counsel admitted this to be true. The Court

---

[6] As Plaintiff wrote in his brief, "[d]eposition testimony has generated evidence that Mulcahy watched Bataille's takedown in surprise rather than playing an active role." ECF No. 121, 5 n.2.

therefore **grants** summary judgment on Count I to Mulcahy. The Court also **grants** Mulcahy's motion for summary judgment on the Count II claim under Section 1983 for failure to intervene. "A police officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 129 (2d Cir. 1997) (internal quotations omitted). Yet Rudavsky appears to acknowledge, and the video appears to corroborate, the fact that Mulcahy was surprised by the takedown and had no time to intervene. As Rudavsky admits, "[o]ur own expert says there was not enough time for Mulcahy to intervene." ECF No. 121 at 31.

### B. Excessive Force Claim Against Bataille

Bataille also moves for summary judgment on the excessive use of force claim, arguing both that (1) the takedown of Rudavsky was a reasonable use of force, and (2) even if the use of force was not reasonable, qualified immunity applies to protect defendants from liability. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). When an official raises qualified immunity as a defense, the court must consider

whether: "(1) . . . the official violated a statutory or
constitutional right, and (2) . . . the right was 'clearly
established' at the time of the challenged conduct." *Ricciuti v.
Gyzenis*, 834 F.3d 162, 167 (2d Cir. 2016) (internal quotation
marks omitted). The Supreme Court has "repeatedly told courts"
that they must not "define clearly established law at a high
level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742
(2011). Though a "case directly on point" is not necessary, for
a right to be clearly established "existing precedent must have
placed the statutory or constitutional question beyond debate."
*White v. Pauly,* 137 S. Ct. 548, 551 (2017) (per curiam)
(internal quotation marks omitted). "In other words, an official
is immune from liability unless, under the particular
circumstances the official faced, any 'reasonable offic[ial]'
would have 'known for certain that the conduct was unlawful'
under then-existing precedent." *Liberian Cmty. Ass'n of Conn. v.
Lamont*, 970 F.3d 174, 187 (2d Cir. 2020) (quoting *Ziglar v.
Abbasi*, 137 S. Ct. 1843, 1867 (2017)). If the facts do not show
that the defendants' conduct violated plaintiffs' constitutional
rights, or if the right was not clearly established at the time
of the defendants' actions, then qualified immunity attaches.
*Golodner v. Berliner*, 770 F.3d 196, 201 (2d Cir. 2014).
"Qualified immunity is an affirmative defense, and the burden is
on the defendant-official to establish it on a motion for

summary judgment." *Bailey v. Pataki,* 708 F.3d 391, 404 (2d Cir. 2013).

### i.   **A Jury Could Find the Use of Force to Be Unreasonable**

To prevail on an excessive force claim brought under the Fourth Amendment, a plaintiff must show that the officer's actions were objectively unreasonable, a showing that will depend on "the facts and circumstances of [the] particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor,* 490 U.S. 386, 396 (1989). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* It follows that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* at 396-97 (internal quotation marks and citation omitted).

For excessive force claims brought under the Fourteenth
Amendment, the Supreme Court has listed out six non-exclusive
factors that "may bear on the reasonableness or unreasonableness
of the force used: the relationship between the need for the use
of force and the amount of force used; the extent of the
plaintiff's injury; any effort made by the officer to temper or
to limit the amount of force; the severity of the security
problem at issue; the threat reasonably perceived by the
officer; and whether the plaintiff was actively resisting."
*Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015); *see also
Edrei v. Maguire*, 892 F.3d 525, 537 (2d Cir. 2018) (holding that
*Kingsley* "provides the appropriate standard for all excessive
force claims brought under the Fourteenth Amendment").

In this case Rudavsky was handcuffed and seated in a
holding room with two police officers standing over him when
Bataille chose to initiate the takedown. He initiated the
takedown without giving any commands to stop wiggling or be
still. As discussed further below, whether or not Rudavsky's
turn to the right could have been considered a threat or
resistance is a genuine issue of material fact that cannot be
resolved by the video recording from the room. The extent of
Rudavsky's head injury is also disputed. Therefore, considering
the evidence in the light most favorable to the nonmoving party,
the Court cannot say that Bataille's use of force was

objectively reasonable. The question must go to a jury. A possible scenario jurors could find is that Bataille reacted violently to Plaintiff's statements to him or to his verbal abuse and was not concerned about Mulcahy's safety or the need to double-lock the handcuffs.

### ii.   **The Right Was Clearly Established**

"Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam) (citing *Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015) (per curiam)). However, Second Circuit cases show that as of January 12, 2015 it was clearly established law in the Second Circuit that officers may not use gratuitous force against a restrained and unresisting arrestee. *See Tracy v. Freshwater*, 623 F.3d 90, 99 n.5 (2d Cir. 2010) ("We do note that it was well established at the time of the underlying altercation that the use of entirely gratuitous force is unreasonable and therefore excessive, *see, e.g., Breen v. Garrison*, 169 F.3d 152, 153 (2d Cir. 1999), and in light of this precedent, we presume that no reasonable officer could have believed that he was entitled to use pepper spray gratuitously against a restrained and unresisting arrestee"); *see also Jones v. Treubig*, 963 F.3d 214,

225 (2d Cir. 2020) ("*Before* the incident at issue here in April

2015, it was clearly established in this Circuit that it is a

Fourth Amendment violation for a police officer to use

significant force against an arrestee who is no longer resisting

and poses no threat to the safety of officers or others."

(emphasis added)).

In a recent Second Circuit case, *Lennox v. Miller*, the

Second Circuit traced its doctrinal evolution of clearly

established law regarding excessive force on handcuffed

arrestees not actively resisting arrest. 968 F.3d 150, 157 (2d

Cir. 2020). The Court explained:

> Years before the incident at issue here, we took note of
> the "well established" principle "that the use of entirely
> gratuitous force is unreasonable and therefore excessive."
> *Tracy v. Freshwater*, 623 F.3d 90, 99 n.5 (2d Cir. 2010). In
> *Tracy*, we presumed that "no reasonable officer could have
> believed that he was entitled to use pepper spray
> gratuitously against a restrained and unresisting
> arrestee," *id.*, an act we held could constitute excessive
> force. We have noted that, under *Tracy*, "[i]t is clearly
> established that officers may not use a taser against a
> compliant or non-threatening suspect," *Muschette ex rel.*
> *A.M. v. Gionfriddo*, 910 F.3d 65, 69 (2d Cir. 2018), even
> though the precise method of excessive force used in
> *Muschette* had not been explicitly proscribed. *Id.* at 69 n.1
> (explaining that "[a]lthough in 2013 there were relatively
> few excessive force cases involving a taser, novel
> technology, without more, does not entitle an officer to
> qualified immunity" (internal quotation marks omitted)).
> And we have not limited potential findings of excessive
> force to situations where officers were using equipment
> like pepper spray or tasers. *See, e.g., Maxwell v. City of*
> *New York*, 380 F.3d 106, 108 (2d Cir. 2004) (refusing to
> grant summary judgment in favor of a police officer who
> allegedly shoved a handcuffed arrestee headfirst into a
> police car, causing her to strike her head on a part of the

car); *cf. Muschette*, 910 F.3d at 69-70 (citing with
approval *Garcia v. Dutchess County*, 43 F. Supp. 3d 281, 297
(S.D.N.Y. 2014), for the proposition that using
"'significant' force against arrestees who no longer
actively resisted arrest or posed a threat to officer
safety" is a clearly established Fourth Amendment violation
in the Second Circuit).

The *Lennox* court concluded that "[o]n July 22, 2016, it was
therefore clearly established by our Circuit caselaw that it is
impermissible to use significant force against a restrained
arrestee who is not actively resisting" and that this was "true
despite differences in the precise method by which that force
was conveyed." *Id*. This Court finds that, based on the evolution
as set forth above, the right was also clearly established as of
January 12, 2015.

The question at issue thus becomes whether Rudavsky was a
restrained and unresisting arrestee. Drawing all inferences for
the non-moving party, as the Court must at the summary judgment
stage, the Court finds that there are still genuine issues of
material fact as to whether or not Rudavsky was resisting (he
was clearly handcuffed). *See, e.g., Bombard v. Volp*, 44 F. Supp.
3d 514, 525-26 (D. Vt. 2014) (declining to grant summary
judgment on the basis of qualified immunity where plaintiff was
shot in the head with a Taser, and questions of fact remained as
to whether he was fleeing arrest, whether he heard the officer's
warnings, whether he acknowledged the officer's presence, and
whether he presented a danger to himself or others).

Defendants argue that this case is one in which an available video recording contradicts the nonmoving party's narrative of material events. Defendants are correct that the Supreme Court has explained that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Thus, in *Scott*, the Court explained that the summary judgment does not call for courts to rely on a "visible fiction" in favor of the nonmoving party, but rather to view "the facts in the light depicted by the videotape." *Id.* at 380-81. Defendants cite to *Scott* to make the argument that this Court should use the videotape to resolve factual disputes at the summary judgment stage.

To use the videotape to resolve the factual dispute of whether or not Rudavsky was resisting would be an overextension of *Scott*. The video in this case does not "blatantly contradict" the record such that no reasonable jury could believe that Rudavsky was not resisting or not posing a threat. Similarly, the Court cannot use the video to say whether Bataille guided Rudavsky to the ground or slammed his head on the floor.

Drawing all inferences for Rudavsky, the video shows him seated on a bench, handcuffed, with two officers standing over

28

him. His legs are underneath him. Bataille's body obscures
Rudavsky's hands, and it is unclear whether Rudavsky was moving
them. Once seated on the bench, Rudavsky does not immediately
move to stand. No one instructs him not to move, or not to
wiggle – he has only been told to sit. Without standing, at one
point he makes a comment that may have been about Bataille being
under investigation, and Rudavsky turns to his right. On the
video, it is apparent that Rudavsky is turning to look at
Bataille, not Mulcahy. Viewing the video in the light most
favorable to Rudavsky, one could view the video and conclude
that Rudavsky posed no threat to Mulcahy (Mulcahy appears
relaxed) and that the movement of Rudavsky's legs, rather than
making it easier to stand, would make it more difficult as one
leg extends in front of him. One could conclude from the video
that Rudavsky merely turned to tell Bataille "I'll bet you're
under investigation." This would not matter if a reasonable
officer in Bataille's shoes would still have thought Rudavsky
posed a risk. However, the video itself shows Bataille raise his
head from Rudavsky's handcuffs as Rudavsky turned. A juror could
view the video and conclude that Bataille made eye contact with
Rudavsky and knew Rudavsky was not moving towards Mulcahy but
was rather directing a comment at Bataille, while fully seated
and fully restrained, posing no risk. This is a genuine issue of
material fact.

Furthermore, though the Officer Defendants argue that "it is undisputed that Bataille made an effort to guide Rudavsky to the floor during the takedown with the objective of preventing injury," this is one of the main disputed facts. Bataille's body obscures Rudavsky's head and shoulders at the end of the takedown. Plaintiff argues that an officer worried about injury to an arrestee would have refrained from double-locking the handcuffs rather than risking head injury by performing a takedown on a handcuffed arrestee. The Court cannot resolve this factual dispute for the parties. Bataille does appear to have both hands on Rudavsky, but whether at the end of the takedown he is guiding rather than slamming, and the exact angle at which Rudavsky's head is forced into the floor, is up for the factfinder to determine.

To resolve these disputes would be to make inferences beyond what the video shows, and such inferences belong to the jury, not this Court. *See Joseph v. Bartlett*, 981 F.3d 319, 345 (5th Cir. 2020) (explaining that under *Scott* courts may not "disregard" the non-moving party's version of the facts unless it is blatantly contradicted by the record, but holding that there is "no such contradiction" where "[t]he video evidence does not eliminate Plaintiffs' narrative"). Juries do not become irrelevant in cases in which there is video evidence, because videos do not promote courts to the position of factfinder;

rather, videos may shed light where the nonmoving party's narrative is blatantly contradicted by them. *See, e.g., McKinney v. Dzurenda*, 555 F. App'x 110, 111-12 (2d Cir. 2014) (summary order) ("As the district court properly concluded, viewing the video footage together with the other evidence, no reasonable fact-finder could conclude that the defendants used force against McKinney maliciously or sadistically to cause harm; rather, they used necessary force in a good faith effort to maintain order and security and re-gain control over him."). That is simply not the case here.

For the reasons set forth in this section, the Court **denies** summary judgment on the excessive force claim against Bataille. The Court **denies** summary judgment on the claim under Article 11 of the Vermont Constitution.

### C. State Law Claims

Rudavsky also brings state law claims for negligence, assault and battery and intentional infliction of emotional distress against Bataille (Counts VI, VIII, and IX). In moving for summary judgment, Bataille argues only that he is entitled to state qualified immunity. In Vermont, qualified immunity "attaches to public officials who are (1) acting during the course of their employment and acting, or reasonably believe they are acting, within the scope of their authority; (2) acting in good faith; and (3) performing discretionary, as opposed to

31

ministerial acts." *Murray v. White*, 155 Vt. 621, 627, 587 A.2d 975, 978 (1991). "Good faith exists where an official's acts did not violate clearly established rights of which the official reasonably should have known." *Id.* at 630, 587 A.2d at 980. Because the Court finds that a jury could find that Bataille did violate clearly established law, the Court **denies** summary judgment on the state law claims.

### III. Solomon's Motion for Summary Judgment

Solomon moved separately for summary judgment on the claims set out against him. The Court already dismissed the excessive force claims against him at the motion to dismiss stage, and Plaintiff has barely addressed Solomon's role beyond excessive force except to say that he rubber-stamped the Use of Excessive Force Report in this case. Both because Plaintiff has given only vague statements as to Solomon's alleged involvement in the case, and for the reasons set forth below dismissing the claims of supervisory liability, the Court **grants** Solomon's motion for summary judgment (ECF No. 115).

### IV.  The Municipal Defendants' Motion for Summary Judgment

### A. Official Policy

It is well established that "under § 1983, local governments are responsible only for 'their *own* illegal acts.' . . . They are not vicariously liable under § 1983 for their employees' actions." *Connick v. Thompson*, 563 U.S. 51, 60 (2011)

(quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)
(emphasis in *Pembaur*)); see *Monell v. Dep't of Soc. Servs. of
the City of New York*, 436 U.S. 658, 691 (1978). Plaintiffs who
seek to impose liability on local governments under Section 1983
must prove that the individuals who violated their federal
rights took "'action pursuant to official municipal policy.'"
*Connick*, 563 U.S. at 60 (quoting *Monell*, 436 U.S. at 691).
"Official municipal policy includes" not only "the decisions of
a government's lawmakers," but also "the acts of its
policymaking officials, and practices so persistent and
widespread as to practically have the force of law. . . . These
are 'action[s] for which the municipality is actually
responsible.'" *Connick*, 563 U.S. at 61 (quoting *Pembaur*, 475
U.S. at 479-80). Accordingly, a § 1983 plaintiff need not prove
that his injury was caused by an explicitly-stated municipal
rule or regulation.

Rudavsky admits that "[a]s it exists on paper, the Policy
seems like it should support the Constitutional Rights set forth
in *Graham* and its progeny: it requires officers to assess the
objective risk posed by the subject's resistance, and then look
to a list of incrementally increasing options to determine the
constitutionally appropriate level of response." ECF No. 122 at
6. However, Rudavsky argues that he nevertheless has a claim
because "the flexibility of the Policy became the means of its

undoing as SBPD officers defined key terms on the fly to meet their needs." Rudavsky argues that the lack of a written definition in the policy for the words "resistance" and "threat" meant that officers could "exploit" these "loopholes." Rudavsky offers no more than these conclusory allegations in support of his argument that the action was taken pursuant to official municipal policy, and so the Court finds that any argument Rudavsky has against the policy itself is insufficient. *See, e.g., Missel v. Cty. of Monroe*, 351 F. App'x 543, 545 (2d Cir. 2009) ("To allege the existence of an affirmative municipal policy, a plaintiff must make factual allegations that support a plausible inference that the constitutional violation took place pursuant either to a formal course of action officially promulgated by the municipality's governing authority or the act of a person with policymaking authority for the municipality." (citing *Vives v. City of N.Y.*, 524 F.3d 346, 350 (2d Cir. 2008)).

**B. Custom or Practice**

The Court notes that it has already reviewed the City's municipal liability once before, when ruling on the City's motion to dismiss. In its Order, the Court noted that Rudavsky's conclusory allegations about the city's custom of condoning the use of excessive force and failure to properly train and/or supervise were by themselves insufficient. *See ECF No. 39.*

However, because Rudavsky also claimed that the City and its police officers consciously failed to adhere to the City's Use of Force Policy by accepting inaccurate reports at odds with existing videotape, the Court allowed the claim to go forward. The Court noted that "[i]n order to succeed on his claims, Rudavsky will need to show not only that a City policymaker failed to act, but that the failure was reflective of a custom or practice and had a causal link to the alleged use of excessive force. . . . Rudavsky contends that there was a practice in the SBPD of downplaying episodes of excessive force, and that this practice allowed Detective Bataille and others to feel safe from retribution or discipline when they used such force. His allegations of falsified reports and inaction by senior officers, including at least one policymaker, amplify his claim. Accordingly, the Court will allow him to develop this theory in the course of discovery…" ECF No. 39 at 10. The briefings and hearing at the summary judgment stage of this case have made apparent that Rudavsky has failed to sufficiently develop his theory, and approaches this Court with almost the same amount of detail on the municipal liability claims as the amount he had at the motion to dismiss stage.

As set out above, a local government is responsible only for its own illegal acts. Accordingly, the Second Circuit has taken care to explain that "inherent in the principle that a

municipality can be liable under § 1983 only where its policies are the moving force behind the constitutional violation is the concept that the plaintiff must show a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Outlaw v. City of Hartford*, 884 F.3d 351, 373 (2d Cir. 2018) (internal citations and quotation marks omitted); *see also Lucente v. Cty. of Suffolk*, 980 F.3d 284, 308 n.9 (2d Cir. 2020) ("For purposes of a § 1983 claim under *Monell*, a plaintiff must demonstrate a 'direct causal link between a municipal policy or custom and the alleged constitutional violation.'" (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)).

Rudavsky argues that the City of South Burlington can be held liable because of a lack of meaningful review of the Use of Force Reports (the officers did not review the video footage of the incident along with the reports), the lack of process for someone to bring a complaint against the SBPD, and a failure to train or supervise. The Court notes that, as is apparent from Rudavsky's briefs and as was admitted by Rudavsky's counsel at the hearing, all of Rudavsky's evidence regarding municipal liability comes from this specific incident with Rudavsky and Dekmar's analysis of the incident. Rudavsky has identified no other past complaints about excessive use of force.

As far as the failure to train or supervise, Rudavsky purports to dispute many of the facts asserted by the Defendants regarding training, but still fails to articulate a theory of liability. The Supreme Court has held that demonstrating a policy of inadequate training requires proof of deliberate indifference by the local government. *Canton*, 489 U.S. at 389 ("Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality -- a 'policy' as defined by our prior cases -- can a city be liable for such a failure under § 1983"). Ordinarily, a pattern of violations is necessary to demonstrate such indifference:

> A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train. Policymakers' continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action – the 'deliberate indifference' – necessary to trigger municipal liability. Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.

*Connick v. Thompson*, 563 U.S. 51, 62 (2011) (internal quotation marks and citations omitted). Though *Connick* and other cases have left open a path for a "narrow range" of circumstances in which a single incident could provide the basis for *Monell* liability, the conclusory allegations set forth by Rudavsky do not meet this bar.

Rudavsky argues that he need not identify other instances besides his own, because he has evidence that it was impossible to file complaints at the SBPD. His evidence of this comes from deposition testimony from officers confused as to the process of filing complaints, along with evidence from this instance, after which Rudavsky made several statements to the officers such as, "you just slammed my head into the ground for no reason!" and they did not follow up with this oral complaint. Yet even assuming that the facts show that Rudavsky lodged an oral complaint that the officers on the scene ignored, his "allegations do not support a *Monell* claim because they focus on the individual officers and isolated events leading to" one incident, "without plausibly alleging a custom or policy pursuant to which those violations occurred." *Cotto v. City of N.Y.*, 803 F. App'x 500, 504 (2d Cir. 2020); *see also Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012) ("[I]solated acts of excessive force by non-policymaking municipal employees are generally not sufficient to demonstrate a municipal custom, policy, or usage that would justify municipal liability."). The causation piece of his argument is still missing.

Rudavsky argues that other cases have allowed *Monell* claims in cases involving inadequate reporting or complaint procedures, and so his claim should survive summary judgment. In support of this argument, Rudavsky cites *Fiacco v. Rensselaer*, 783 F.2d 319

(2d Cir. 1986). However, in that case the plaintiff called to the stand four people who had submitted complaints in the five years before the incident involving Fiacco and introduced seven written claims that had been filed. *Fiacco*, 783 F.2d at 329. In this case, Rudavsky has had the benefit of discovery and yet he is still only able to make conclusory claims based on this one instance. He has identified nothing specifically wrong with the training procedures or policies at the SBPD that would have had a causal link to the alleged constitutional deprivation in this case, and he has not shown circumstantial evidence of a pattern of wrongs or of deliberate indifference. The Court therefore **grants** summary judgment on the municipal liability claims.

## V.   Supervisory Liability

"To establish the liability of a supervisory official under 1983, a plaintiff must show the defendant's personal involvement in the alleged constitutional violations." *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 667 (2009) ("In a § 1983 suit . . . the term 'supervisory liability' is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct.").

Plaintiff makes only a very brief argument regarding Count IV, the supervisory liability of Whipple, Edwards, Martel and

Solomon. He argues that Whipple and Edwards "removed the teeth" from the Use of Force Review process, and that all four defendants rubber stamped the reports. He writes, "Plaintiff is confident that the Court will deny South Burlington's summary judgment motion on failure to train/failure to supervise. When it does, it should do the same to the individual supervisors' motions." ECF 122 at 31. As set out above, the Court granted the motion for summary judgment on the claims against the municipality. Because Plaintiff advances no new arguments for supervisory liability against the individual officials, the Court also **grants** the motion for summary judgment on this count.

Alternatively, the Court grants the motion for summary judgment on this count under qualified immunity. "A supervisor is protected by qualified immunity so long as reasonable officials could disagree about whether the supervisor's action was grossly negligent in light of clearly established law." *Raspardo v. Carlone*, 770 F.3d 97, 116-17 (2d Cir. 2014). The Court agrees with Defendants that, even examining the evidence in the light most favorable to Plaintiff, the most the evidence could possibly show is that reasonable officials could disagree about the supervision of Bataille.

Here, Plaintiff asks the Court to make a huge leap. By his own admission, he only has evidence of a potential constitutional violation in this one incident, and yet he asks

the Court to infer, even after he has had the benefit of
discovery, that the reason he could find no other evidence was
because of a cover-up at the SBPD. Yet the only evidence
Plaintiff has of a cover-up is confusion as to whether a
complaint was filed in this incident. The Court finds that all
of Plaintiff's claims regarding the municipal and supervisory
liability claims are conclusory, and so summary judgment is
**granted** on these claims.

## VI.   Remaining State Claims

As discussed above, Count VI of this case alleges that
Bataille, Mulcahy, and South Burlington are liable under 24
V.S.A. §s 901 and 901a for the "negligence, recklessness or
intentional actions" taken by the Officer Defendants, and that
"[p]ursuant to 24 V.S.A. § 901a, the City of South Burlington is
liable to Rudavsky for the torts of its police officers and is
barred from raising a defense of sovereign and/or municipal
immunity." ECF No. 7 at 17. § 901a requires that "suits against
police officers acting in their official capacity be brought
against the municipality." *Hee v. Everlof*, 812 F. Supp. 1350,
1351 (D. Vt. 1993). When a municipality is "properly named as a
defendant under § 901(a) or § 901a," it is "only entitled to
raise the defenses" that the police officer could raise.
*Galipeau v. Stemp*, No. 5:14-CV-55, 2016 WL 3190659 at *15 (D.
Vt. June 6, 2016). The Court **denies** summary judgment on the

claim against South Burlington, because for the reasons set forth above Bataille's actions are not protected from suit by qualified immunity.

Count VII also cites to 24 V.S.A. §s 901 and 901a, alleging claims against the City of South Burlington, Whipple, Martel, Edwards, and Solomon for negligent training, retention and supervision. Count X is a claim against the City of South Burlington for vicarious liability for the misconduct of Bataille. In its order denying Defendants' motion to dismiss on Counts VII and X, this Court wrote in part that:

> … foreseeability in this case may be determined by the customs or practices in the SBPD, which have yet to be proven. At the pleading stage, the Court will allow discovery on those questions and permit the vicarious liability claims against the Municipal Defendants to proceed. The claims of failure to properly train, supervise, and retain are similarly enmeshed with the alleged policies, customs, and practices, and will be allowed to proceed as well.

ECF No. 39 at 17-18. However, as explained in more detail above, after discovery Plaintiff has failed to provide any further evidence of customs or practices, and has only been able to show one example of excessive force (this very instance). The Court cannot allow claims supported by little more than conclusory statements to continue beyond this stage of litigation. The Court thus **dismisses** Counts VII and X.

The Court finds in the alternative that, as far as the direct claims against the City of South Burlington in Count VII

and Count X, it is entitled to municipal immunity for the
provision of police services, a governmental function. *See
Brunette v. City of Burlington*, 2018 U.S. Dist. LEXIS 148141 at
*112-113 (D. Vt. Aug. 30, 2018). Furthermore, as Defendants
point out, Plaintiff barely addressed the issues of qualified
immunity and municipal immunity (which he confused with
sovereign immunity) in his briefing and did not distinguish
between direct and indirect claims. Despite having the burden to
rebut the qualified immunity defense as dictated by the Vermont
Supreme Court, *Sprague v. Nally*, 2005 VT 85 ¶ 4 n.3, 178 Vt.
222, 225 n.3 (2005), Plaintiff failed to explain why qualified
immunity would not apply to the City, standing indirectly in the
shoes of Whipple, Edwards, Martel, and Solomon. Yet *Civetti v.
Turner*, a recent Vermont Supreme Court case cited to by both
parties, was clear that municipalities standing in their
employees' shoes can raise the defenses available to those
employees. 2020 VT 23, ¶15, 233 A.3d 1056, 1061. Plaintiff has
failed to fully address or support these claims, and thus he has
forfeited them.

## VII. Conclusion

For the reasons set forth above, the Court **grants** summary
judgment on all claims except for the claims against Defendant
Bataille for the use of excessive force, and the associated
state claims. The claims remaining in this case are Count I

(excessive force claim against Bataille), Count VI (citing to 24 V.S.A. §s 901 and 901a for Bataille's negligence, recklessness or intentional actions), and Counts VIII and IX (common law claims for assault and battery and intentional infliction of emotional distress). Thus the motion for summary judgment filed by the Municipal Defendants is **granted in part and denied in part** (ECF No. 112); the motion for summary judgment filed by David Solomon is **granted** (ECF No. 115); and the motion for summary judgment filed by the Officer Defendants is **granted in part and denied in part** (ECF No. 114).

DATED at Burlington, in the District of Vermont, this 11th day of May, 2021.

/s/ William K. Sessions III
William K. Sessions III
U.S. District Court Judge